UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| STEPHEN DOUGLAS HILL et al.<br><br>    Plaintiff,<br><br>vs.<br><br>CITY OF FOUNTAIN VALLEY et al.<br><br>    Defendants. | Case No. SA 8:20-CV-00705-DOC-(DFMx)<br><br><br>ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND REMANDING THE CASE TO STATE COURT [33] |

Before the Court is Defendants' City of Fountain Valley, Stuart Chase, Gannon Kelly, and James Cataline (collectively "Defendants") Motion for Summary Judgment ("Motion" or "Mot."). The Court heard oral argument on this matter on July 8, 2021. Having reviewed the papers and considered the parties' arguments, the Court GRANTS Defendants' Motion.

**I. BACKGROUND**

This case arises out of Fountain Valley Police Officers Stuart Chase and Gannon Kelly's (collectively the "Officers") encounter with Stephen Hill, Teresa Hill, Brett Hill, C.H., a minor, and A.H., a minor (collectively "Plaintiffs"). *See generally* First Amended Complaint ("FAC") (Dkt. 31). The FAC alleges ten causes of action stemming from this encounter: (1) Unreasonable Use of Force in Violation of the Fourth Amendment (42 U.S.C. § 1983); (2) Unreasonable Seizure of Person in Violation of the Fourth Amendment (42 U.S.C. § 1983); (3) *Monell* Claim for Failure to Train (42 U.S.C. § 1983); (4) Violation of the Right to Speak Freely in Violation of the First Amendment (42 U.S.C. § 1983); (5) Excessive Use of Force in Violation of the Bane Act (Cal. Civ. Code § 52.1); (6) False Arrest/Imprisonment; (7) Battery; (8) Assault; (9) Intentional Infliction of Emotional Distress; (10) Negligent Infliction of Emotional Distress. *See generally id.*

**A. FACTS[1]**

On April 30, 2019, at approximately 9:00 p.m., the Fountain Valley Dispatch received a report of a "dark grey Ford Mustang" seen "driving erratically" with a female passenger who appeared to be blindfolded. Declaration of Stuart Chase ("Chase Dec.") p. 24, ¶ 3 (Dkt. 33). The vehicle was registered to Benjamin Hill ("Benjamin") who lived at 16706 Maple Street in Fountain Valley, California (the "Residence"). *Id.*, ¶ 4.

Fountain Valley Police Officers Gannon Kelly and Stuart Chase went to the Residence. *Id.*, ¶ 3. They pulled into the Residence's driveway and up to a closed garage with no windows. *Id.*, ¶ 6. The Officers thought the Mustang might be inside. *Id.*, ¶¶ 8, 10.

---

[1] Unless indicated otherwise, to the extent any of these facts are disputed, the Court concludes they are not material to the disposition of the Motion. Further, to the extent the Court relies on evidence to which the parties have objected, the Court has considered and overruled those objections. As to any remaining objections, the Court finds it unnecessary to rule on them because the Court does not rely on the disputed evidence.

Shortly after the Officers arrived, Teresa Hill ("Teresa"), who lived at the Residence, pulled into the driveway next to the Officers. *Id.*, ¶ 11. The Officers asked Teresa about Benjamin's whereabouts. *Id.*, ¶ 12. Teresa informed them Benjamin was her son, that he lived at the Residence, and that he drove a grey Mustang; however, she stated Benjamin was not home. *Id.*, ¶¶ 12-14. The Officers asked Teresa for Benjamin's phone number, but she refused because she wanted to ensure she could contact Benjamin before the Officers did to warn him the police were at the Residence. Deposition of Teresa Hill ("Teresa Depo.") 21:15-22:11 (Dkt. 43-1).

When Stephen Hill ("Stephen") saw the Officers talking to his wife, Stephen exited the Residence and approached the Officers. Chase Dec. p. 25, ¶ 17. The Officers asked Stephen for his Benjamin's phone number, but, like Teresa, he initially refused. *Id.* ¶¶ 24-25. Stephen offered to give Benjamin the Officers' business cards when Benjamin returned home but would not provide Stephen's phone number because he wanted to ensure everything was "on the up and up." *Id.*

After more conversation, Teresa went inside to get Benjamin's phone number, but Stephen stated he needed to stay outside with his granddaughter, C.H., who was asleep in Teresa's car. *Id.* ¶ 29. The Officers suggested Stephen bring C.H. inside so that he could also look for Benjamin's phone number in the Residence. *Id.*; Audio Belt Recording of Gannon Kelly ("Gannon Recording") 2:45-3:10 (Dkt. 43). The Officers never told Stephen he was detained before he entered the Residence. Deposition of Stuart Chase ("Chase Depo.") 38:15-39:4 (Dkt. 43).

Still on the driveway, Officer Chase saw some movement through the window of Stephen and Teresa's bedroom. Police Report of Stuart Chase ("Chase Report"), p. 1, ¶ 4 (Dkt. 43). Officer Chase walked across the lawn and saw a man matching Benjamin's description in the bedroom. *Id.* The Officers asked the man to come outside, but the man walked out of the Officers' sight. Declaration of Stephen Hill ("Stephen Decl.") ¶¶ 39-44 (Dkt. 44). The man, the Officers later found out, was not Benjamin, but his brother, Brett Hill ("Brett"). *Id.*

Stephen then walked into the bedroom, and Officer Chase, through the window, asked "Hey, who's that person over there?" apparently referencing Brett who was now standing in the hallway. Chase Dec. p. 25 ¶ 35. Stephen maintains he did not hear Officer Chase's question. Stephen Decl. ¶ 39. Stephen closed the curtains the Officers were looking through. Chase Dec. p. 26, ¶ 36.

The Officers went to the front door and looked through a window at the top of the front door. Declaration of Gannon Kelly ("Kelly Dec.") p. 31 ¶¶ 11-12 (Dkt. 33); Chase Dec. p. 26 ¶ 37. Shining a flashlight through the window, Officer Kelly saw the unknown male who matched Benjamin's description (i.e., Brett), Teresa, and Stephen inside. Kelly Dec. p. 31, ¶ 13. Officer Kelly checked the door to find it locked. Kelly Dec. p. 31 ¶ 14. 14. A verbal exchange followed where the Officers stated "Guys, come outside," which Teresa interpreted to refer to Brett and Stephen. Teresa Depo. 29:10-13. The Officers did not order the two minors, A.H. and C.H., to come outside. *Id.*

Stephen opened the door and came out of the residence, while Brett and Teresa remained inside. Chase Dec. p. 26, ¶ 40. As Stephen closed the door, Officer Kelly put his foot in the doorjamb to prevent it from closing. Deposition of Gannon Kelly ("Kelly Depo.") p. 43:18-44:9 (Dkt. 43). The Officers grabbed Stephen and walked him to the grass to avoid taking him down on concrete. Stephen Decl. ¶ 64-72. Once on the grass, Stephen was pushed down to his knees then prone. Deposition of Stephen Hill ("Stephen Depo.") 60:4-6 (Dkt. 33). While being pushed to the ground, Stephen's head hit the grass and his glasses cut his forehead. *Id.* 62: 6-9. This was Stephen's only injury. *See generally* Statement of Undisputed Facts ("SUF") (Dkt. 33).

Shortly after the Officers' confrontation with Stephen began, Brett and Teresa exited the Residence, and the Officers told Brett and Teresa not to approach. Ex. M (Dkt. 33). Brett was subsequently searched for weapons, and, at this point, the Officers discovered the man matching the driver's description was Brett, Benjamin's brother, and thus not the driver. Chase Dec. p. 27 ¶ 56. Stephen was placed under arrest, cited for violation of Penal Code section

148(a)(1) for obstructing a police officer, and taken to the hospital for medical clearance. Chase Dec. p. 27 ¶ 59.

## B. PROCEDURAL HISTORY

Plaintiffs filed their First Amended Complaint on September 19, 2020, alleging ten causes of action. Defendants moved for summary judgment on all ten of these causes of action on May 5, 2021. Plaintiffs opposed the motion on June 25, 2021. Opposition to Plaintiffs' Motion for Summary Judgment ("Opp'n.") (Dkt. 44).

## II. LEGAL STANDARD

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried before a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248–49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific,

admissible, evidence identifying the basis for the dispute. *See id.* The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

## III. DISCUSSION

Defendants argue all ten of Plaintiffs' causes of action fail as a matter of law based on the undisputed facts. *See generally* Mot. The Court analyzes each cause of action in turn.

### A. Claims Arising Out of the Officers' Use of Force Against Stephen Hill

Plaintiffs' first cause of action (Unreasonable Use of Force in Violation of the Fourth Amendment (42 U.S.C. § 1983)), fifth cause of action (Excessive Use of Force in Violation of the Bane Act (Cal. Civ. Code § 52.1)), seventh cause of action (battery), and eighth cause of action (assault) all involve the force the Officers used on Stephen after he exited the Residence. *See generally* FAC. Claims for excessive force, both under § 1983 and the Bane Act, battery, and assault are governed by the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865 (1989); *Cornell v. City & County of San Francisco*, 17 Cal. App. 5th 766, 796 (2017) (holding Bane Act claims based on excessive force are governed by the same reasonableness standard as § 1983 claims for excessive force); *Koussaya v. City of Stockton*, 54 Cal. App. 5th 909, 932 (2020) (ruling state law assault and battery claims are "a counterpart to a federal claim of excessive use of force and requires proof that the officer's use of force was unreasonable"); *Olvera v. City of Modesto*, 38 F. Supp. 3d 1162, 1181 (E.D. Cal 2014) ("The reasonableness standard for a claim of [California] state law battery by a peace officer is the same as the Fourth Amendment reasonableness standard for excessive force claims."). Accordingly, if the undisputed facts support Defendants' theory that

the Officers used reasonable force against Stephen, then summary judgment on the first, fifth, seventh, and eighth causes of action is appropriate.

Defendants maintain the Officers' use of force was reasonable because it was necessary to overcome Stephen's resistance, ensure their safety, and investigate the report of erratic driving. Mot. at 15-16. Stephen maintains the Officers were unnecessarily violent with him because, despite his compliance, they "threw him on the ground," "put[] their knees in his back," and "smash[ed] his face into the ground." Opp'n. at 18. The Court agrees with Defendants that the Officers' use of force was reasonable.

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. "Relevant factors to this inquiry include, but are not limited to, 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (*quoting Forrester v. City of San Diego*, 25F.3d 804, 806 n.2 (9th Cir. 1994)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers'" constitutes a Fourth Amendment violation. *Id.* (*quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). The inquiry into unreasonable force requires the court to evaluate the facts and circumstances of the case and "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-7.

For example, a court did not grant summary judgment in a group of officers' favor after they gang tackled, repeatedly punched, and applied hobble restraints to a complying subject. *Blankenhorn*, 485 F.3d at 478-80. There, the officers responded to a report of misdemeanor

trespass. *Id.* at 478. After a brief conversation regarding the man's identification, one officer threatened to spray him with mace and grabbed the suspect's arm. *Id.* When asked to kneel, plaintiff refused. *Id.* He did not take a combative stance or make other threatening movements. *Id.* Without warning, three officers then tackled the plaintiff, and plaintiff did not resist while on the ground. *Id.* The officers placed hobble restraints on his ankles, making it difficult for plaintiff to move and breathe, and one officer repeatedly punched him. *Id.* The court did not grant summary judgment in the officers' favor because the government's interest in investigating plaintiff's alleged misdemeanor trespass did not outweigh plaintiff's interest in bodily security as a matter of law. *Id.* The court considered several factors. First, the government's interest was minor because the plaintiff's crime, misdemeanor trespass, was not particularly serious, and the relatively calm demeanor of the defendant suggested he posed little risk to the public or the officers. *Id.* at 480. Moreover, previous encounters between the plaintiff and these officers were cordial and constructive, further suggesting the government's interest in public or the officers' safety was minimal. *Id.* On the opposite side of the ledger, the plaintiffs' interest in bodily security was severely violated. *Id.* The plaintiff was outnumbered by the officers, the officers' force was far greater than his resistance, and the force continued long after the plaintiff's minimal resistance ceased. *Id.* Since the balance of factors did not support the amount of force was reasonable, the court denied the defendant officers' motion for summary judgment. *Id.*

By contrast, in *Jackson v. City of Bremerton*, the court found defendant officers were entitled to summary judgment on a plaintiff's excessive use of force claim. 268 F.3d 646 (9th Cir. 2001). There, the plaintiff tried to shield a friend from being arrested for a misdemeanor at a picnic. *Id.* at 649. One officer sprayed her with pepper spray, three officers pushed her to the ground, and, after being placed in the police car, "an officer rolled up the windows and turned up the engine in the July heat in order to 'adjust her attitude.'" *Id.* at 652. The Court found, despite this significant use of force, the government's interest was greater than the plaintiff's interest the officers invaded. First, since the police officers were "substantially outnumbered" at the picnic, they had a reasonable fear for their safety. *Id.* at 652-53. This safety interest

became even more significant after the picnic goers did not disperse when the officers threatened to use pepper spray. *Id.* Second, the situation was "rapidly evolving and escalating," which partially justified the officers' use of force. *Id.*; *see also Terry v. Ohio*, 392 U.S. 1, 20-22 (1968) (requiring courts to consider how "tense, uncertain, and rapidly evolving" the situation is in determining the reasonableness of a use of force). Finally, the plaintiff's crime, obstructing the police officers, was a serious crime that society has an important interest in stopping. *Jackson*, 268 F.3d at 653. Accordingly, the court concluded the force used was reasonable, making summary judgment in the defendant officers' favor appropriate. *Id.*

Here, for reasons described below, the Court finds the government's interest in its officers' and the public's safety outweighs the infringement of Stephen's interest in being free from forceful arrests. As such, the use of force was reasonable.

### 1. Stephen's Interest

After he stepped out of the residence, Stephen was grabbed by the Officers, marched to the grass, and pushed to his knees and then to a prone position. *See generally* SUF. During the fall, his glasses created a cut on his forehead, which was his only physical injury. Stephen Decl. ¶¶ 59-71. The intrusion on Stephen's interest thus seems minimal, especially when compared with the maced plaintiff who was forced to sit in a hot car in *Jackson*.

### 2. The Government's Interest

While Stephen has an interest in being free from forceful arrests, existence of this interest is not dispositive. When weighed against the Officers' interest in their own and the public's safety, the Court concludes the use of force was reasonable. Similar to *Jackson*, the Officers here were outnumbered by the Hill family and the situation was "tense and escalating rapidly," SUF 50, meaning the Officers had a reasonable concern for their safety. *See Jackson*, 268 F.3d at 652. This concern is further heightened by the Officer's previous interactions with Stephen. Unlike the *Blankenhorn* officers' previous interactions with the plaintiff, here, the Officers' previous interaction with Stephen was not cooperative and constructive. *See* 485 F.3d at 480. Stephen did not give the Officers Benjamin's phone number and seemed skeptical of

the Officers' motives. *See* SUF 20-25. After Stephen entered the Residence, he shut the curtains in the Officers' faces, which, arguably could be seen as an evasive movement, and multiple courts have held evasive movements are probative of whether the officers had a reasonable concern for their safety. *See, e.g. United States v. Salvador*, 740 F.2d 752, 758 (9th Cir. 1984) (holding closing the window curtains on an officer can suggest occupants are preparing "to do battle"); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) (holding an attempt to hide or evade the authorities would cause a reasonable officer to fear for their safety).[2]

In addition to the Officer's safety interest, the government has a well-recognized interest in preventing obstructions with law enforcement's investigations. In *Jackson*, the plaintiff, like Stephen here, was arrested for obstructing a peace officer. *See* 268 F.3d at 653. Moreover, the underlying crime the Officers were investigating—reckless driving and a possible kidnapping—are especially serious and dangerous. *See United States v. Del Vizo*, 918 F.2d 821, 826 (9th Cir. 1990) (holding erratic driving is "indicative of criminal goings-on").

### 3. Balancing Interests

The Court, based on the undisputed facts, finds the public interest—the Officers' interest in their own safety plus the interest of society advanced when people cooperate with police investigations—outweighs the intrusion on Stephen's interest in being free from forceful arrests. Indeed, the government's interest here is similar to that the officers had in *Jackson*, and Stephen was subject to less force than the plaintiff in *Jackson*. As such, the Officers' use of force while effectuating Stephen's arrest was reasonable. Accordingly, the Court GRANTS Defendants' motion for summary judgment with respect to Plaintiffs' first and fifth causes of action for excessive force, seventh cause of action for assault, and eighth cause of action for battery.

---

[2] Stephen maintains he shut the curtains to prevent the Officers' flashlights from waking up his granddaughter, who was sleeping in his room. Taking this statement as true, as the Court must in this stage of the litigation, it is unavailing, because the inquiry into the reasonableness of an officer's fear of their own safety is judged from the eyes of the officer. *See Blankenhorn*, 485 F.3d at 477. And the Officers did not know Stephen's motivation for closing the blinds.

### B. Unreasonable Seizure of Persons

The second cause of action alleges all the Plaintiffs were subject to an unreasonable seizure of their persons in violation of the Fourth Amendment. *See generally* FAC.

Plaintiffs maintain that the Officers saying "Guys, come out here" while the Hills were inside the Residence before being arrested or patted down constituted an unreasonable seizure of their persons. *See generally* Opp'n. Plaintiffs argue, while they were seized outside the Residence, the arrests constructively occurred within the home, and the arrests were supported by neither probable cause nor justified by an emergency situation. *See generally id.* Since warrantless arrests that occur in the home must be supported by probable cause and effectuated only in emergency situations, the Officers violated the Plaintiffs' Fourth Amendment rights to be free of unreasonable seizures of their persons *See generally id.* Defendants argue the seizures, either constructively or literally, did not occur within the home, or, in the alternative, there was both probable cause and exigency. Mot. at 12. Thus, according to Defendants, the Officers' behavior comported the Fourth Amendment. *Id.* The Court agrees with Defendants.

Before reaching the merits of the parties' arguments, the Court must first determine which of the five plaintiffs has a colorable Fourth Amendment seizure claim. Plaintiffs' FAC alleges all Plaintiffs—Stephen, Brett, Teresa, C.H., and A.H.—were all unlawfully seized. The Court disagrees. An unlawful seizure requires a seizure. Seizures require "*either* physical force . . . *or*, where that is absent, submission to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis in original). For example, if a policeman yells "'Stop, in the name of the law!' at a fleeing form that continues to flee," there is "no seizure" because there is neither physical force nor submission. *Id.* Here, it is undisputed C.H., A.H., and Teresa were not seized. As such, the Court GRANTS Defendants' motion with respect to Teresa, C.H., and A.H.'s claim for unreasonable seizure.

Therefore, the Court only must analyze whether the Officers' ordering Brett and Stephen out of the Residence was, constructively, an arrest within the home absent probable cause and exigent circumstances.

#### 1. The Seizures of Brett and Stephen Took Place Within the Home

"The Fourth Amendment has drawn a firm line at the entrance to the house," and "absent exigent circumstances that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 589-90 (1980). The *Payton* Court designed this rule to "protect the privacy and the sanctity of the home." *Id.* at 588. However, read literally, the *Payton* rule would offer little privacy, because, through a show of authority, officers could force individuals out of their private sanctuary, after which they could be freely arrested. To protect one's privacy within the home and comport with the spirit of *Payton*, *Payton*'s progeny have held "the area immediately surrounding and associated with the home," or the "curtilage," is "part of the home itself for Fourth Amendment purposes." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quotations and citations omitted). "This area around the home is intimately linked to the home, both physically and psychologically, and is where privacy expectations are most heightened." *Id.* at 7.

Applying this standard, the Ninth Circuit held an individual was "inside his home for purposes of the *Payton* rule" when they were arrested in their front yard after officers surrounded his house. *United States v. Nora*, 765 F.3d 1049, 1054 (9th Cir. 2014). Since no one could enjoy the privacy of their home with officers surrounding it, the court ruled the government, absent a warrant, had to show both probable cause and exigent circumstances for the arrest to accord with the Fourth Amendment's guarantees. *Id.*

Here too, Brett and Stephen were in their home when they were ordered outside by the Officers, who were standing on the Residence's curtilage. SUF 35-47. Like the individual in *Nora*, Brett and Stephen would not be able to be enjoy the privacy of their home with the Officers standing on the curtilage and pointing a flashlight into the Residence. *See* 765 F.3d at 1054. For purposes of the *Payton* rule, then, the seizures occurred inside the home. Accordingly, the Officers' seizure of Brett and Stephen is constitutional only if it is supported by probable cause and there are exigent circumstances. The Court finds, for reasons explained below, both are present here, making the seizures lawful.

**2. Probable Cause with Respect to Brett**

Probable cause exists where the "available facts suggest a fair probability that the suspect has committed a crime." *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006). "It is well established that the judgments made by law enforcement officers in the heat of their battle against crime need not be assessed in the abstract; weight may be given to the experienced judgment of officers. *United States v. Valencia-Amezuca*, 278 F.3d 901, 906 (9th Cir. 2002).

Here, the Officers had reasonable suspicion to believe the man they saw through the bedroom window (i.e., Brett) was the reckless driver. The Officers responded to a 911 call regarding an erratic driver with a blindfolded passenger. SUF 1. And erratic driving is "indicative of criminal goings-on." *United States v. Del Vizo*, 918 F.2d 821, 826 (9th Cir. 1990). This is especially true when the erratic driver has a blindfolded woman in the passenger seat. Moreover, the 911 caller said the driver was a "male, white" and between 25-30 with "black hair and possible facial hair." SUF 2. The Officers were entitled to credit this description because 911 callers are considered reliable sources. *See Navarette v. California*, 572 U.S. 393, 400 (2014). Thus, when the Officers saw a man in the Residence matching this description, they could conclude, with a fair probability, the man was the reckless driver. *See United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010) (holding "substantial correspondence" between the officers' observations and individual's description was sufficient for probable cause). Thus, with respect to the seizure of Brett's person (i.e., the pat down), the Officers had probable cause to suspect he was engaged in criminal activity.

### 3. Probable Cause with Respect to Stephen

Based on the undisputed facts, the Officers did not have probable cause to arrest Stephen. The Officers maintain they had probable cause to arrest Stephen for violating Cal. Penal Code §148, which outlaws "willfully resist[ing], delay[ing], or obstruct[ing] any . . . peace officer . . . in the discharge of their duties." Here, Stephen's alleged "resist[ing], delay[ing], or obstruct[ing]" of the Officers was not providing Benjamin's phone number in the driveway and shutting the curtains in the Officers' face while they were looking through the

window. This, a reasonable jury could find, was not an effort to obstruct or conceal but, rather, a refusal to cooperate with the Officers' investigation. And it is "well established" that "even an outright refusal to cooperate with police officers cannot create adequate grounds" for probable cause under Cal. Penal Code §148. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1023 (9th Cir. 2015).

Nonetheless, qualified immunity protects the Officers with respect to the Officers' mistaken conclusion they had probable cause to arrest Stephen. "Qualified immunity is a question of law, not of fact." *Estate of Garcia Toribio v. City of Santa Rosa*, 381 F. Supp. 3d 1179, 1189 (N.D. Cal. 2019) (citing *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008). Qualified immunity applies "if a reasonable officer *could* have believed that probable cause existed to arrest." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (emphasis added). An officer who "reasonably but mistakenly concludes that probable cause is present is entitled to immunity." *Id.* at 227. This standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 343 (1986).

Here, it is reasonable—and certainly not indicative of plain incompetence or purposeful unlawfulness—for the Officers to conclude probable cause was present to arrest Stephen. A reasonable officer could have interpreted Stephen's shutting of the curtains and standing between Brett and the front door as an effort to conceal the suspect. This would clearly delay or obstruct the Officers' investigation into what was happening in Benjamin's car, meaning a reasonable officer could conclude Stephen violated §148. Moreover, the Officers were investigating a serious crime (a possible kidnapping) and both parties concede the situation was tense and escalating rapidly. SUF 50. The qualified immunity doctrine exists because "officials should not err always on the side of caution" because they fear being sued. *Davis v. Scherer*, 468 U.S. 183, 195 (1984). Thus, in holding the qualified immunity doctrine applies to the Officers' mistaken determination probable cause to arrest Stephen was present, the Court comports with the spirit of the qualified immunity doctrine: protecting officers who are reasonably carrying out their duties in tense, rapidly-evolving situations.

### 4. Exigency was Present

Exigent circumstances include the need to protect an officer or the public from danger, the need to avoid imminent destruction of evidence, when entry in "hot pursuit" is necessary to suspect a criminal suspect's escape, and to respond to fires or other emergencies. *United States v. Brooks*, 367 F.3d 1128, 1133, n.5 (9th Cir. 2004).

In the encounter between the Officers and the Hills, there were significant exigent circumstances.

First, the Officers were responding to a suspected case of erratic driving and kidnapping, and the person they saw through the Residence's window matched the description of the driver. In *People v. Suarez*, a California appellate court held a similar situation justified officers entering a home, without a warrant and without permission, to conduct a protective sweep. 10 Cal. 5th 116 (2020). The Officers were therefore justified in ordering Brett out of the home to increase the chances the alleged kidnapping victim was safe.

Second, the Officers had a reasonable fear for their safety, creating exigency. Shutting windows on officers suggests occupants of the house are preparing "to do battle." *United States v. Salvador*, 740 F.2d 752, 758 (9th Cir. 1984). Since the Officers did not know what was going in on the home behind the curtains, they were justified in ordering Brett—the man they believed to be the reckless driver—out of the home.

Third, there was a reasonable fear the Hills were inside destroying evidence or taking other actions to conceal the suspect. For example, the man matching the suspect's description went into the hallway, out of the Officer's sight, after being called by the Officers, and Stephen shut the curtains on the Officers. These arguably evasive actions created exigencies. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985) (finding evasive actions support exigency).

These facts, combined with the Ninth Circuit's instruction that the Court should not scrutinize too closely an officer's determination of emergency situations, leads the Court to conclude exigent circumstances existed. *See United States v. Snipe*, 515 F.2d 947, 953-54 (9th Cir. 2008) ("The police will routinely be summoned for matters that are not, in the objective

sense, real emergencies. We do not impose a duty of inquiry on the police to separate a true cry for help from a less deserving call for attention because the delay may cost lives.").

The seizure of Brett and Stephen's person, even though they constructively occurred in the home, are not actionable. With respect to Brett, the Officers had probable cause to believe he was the driver of the erratic car and exigency was present. With respect to Stephen, exigency was similarly present, and the Officers' mistaken belief probable cause was present is overcome by the qualified immunity doctrine. Thus, the Court GRANTS Defendant's motion with respect to Plaintiff's second cause of action.

### C. False Arrest/Imprisonment

For their sixth cause of action, all Plaintiffs allege they were falsely arrested or falsely imprisoned by the Officers. *See generally* FAC.

In California, false arrest and false imprisonment are not distinguishable torts, and "[f]alse imprisonment is 'the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short.'" *George v. City of Long Beach*, 973 F.2d 706, 710 (9th Cir. 1992) (*quoting Molko v. Holy Spirit Ass'n for Unification of World Christianity*, 46 Cal.3d 1092 (1992), *cert. denied*, 490 U.S. 1084 (1989)). California Government Code § 820.4 states, "[a] public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment." Cal. Gov't Code § 820.4.

California Penal Code § 847(b)(1) states that there shall be no liability for false imprisonment against a law enforcement officer acting in the scope of his authority if "[t]he arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful." Cal. Penal Code § 847(b)(1). In *Cornell v. City & Cty. Of San Francisco*, a California appeals court, despite the use of the disjunctive "or" in the immunities statute, held "Penal Code section 847 is coextensive with the doctrine of probable cause, but goes no further." 17 Cal. App. 5th 766, 788 (2017). In so ruling, the court declined to import federal qualified immunity into California law. *Id.* at 790. The upshot of *Cornell* is that "under California law, a police officer is not granted governmental immunity for false arrest and

imprisonment" when they effectuate an arrest absent probable cause. *O'Toole v. Superior Court*, 140 Cal. App. 4th 488, 510 (2006).

As described above, the Officers did have probable cause to seize Brett's person, so the Court GRANTS Defendant's Motion with respect to Plaintiff's cause of action for false arrest of Brett. However, since the Officers did not have probable cause to seize Stephen's person, the Court DENIES Defendant's motion. Since false arrest is a state law claim, the Court REMANDS this cause of action to California state court pursuant to 28 U.S.C. § 1367, which allows this Court to decline subject matter jurisdiction after it has "dismissed all claims over which it has original jurisdiction."

### D. First Amendment Claim

Stephen argues his arrest was motivated by the Officers' retaliatory animus. Opp'n at 20. In particular, he argues that asking the Officers "can you guys tell me what's really going on?" and saying that he wanted "to make sure that, uh, everything's on the up and up" perturbed the officers and "became the basis of Defendants' decision to arrest" him. *Id*. This, according to Stephen, violated his First Amendment right to speak free of fear of government retaliation. *Id.*

The First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, 204 L. Ed. 2d 1 (2019). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id*. (citing *Hartman v. Moore*, 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006)).

To prevail on such a claim, a plaintiff must establish a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's "subsequent injury." *Id*. (citing *Hartman*, 547 U.S. at 259, 126 S.Ct. 1695). Specifically, the retaliatory animus must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive. *Id. (citing Hartman*, 547 U.S. at 260, 126 S.Ct. 1695

(recognizing that although it "may be dishonorable to act with an unconstitutional motive," an official's "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway")).

Here, Stephen's words were not a but-for cause of his arrest. As described above, while the Officers did not have probable cause to arrest Stephen, they reasonably could have believed probable cause was present. And existence of probable cause generally defeats a plaintiff's First Amendment claim, because the reasonable suspicion of a crime—not a retaliatory motive—is likely the driving force behind the arrest. The Court finds the Officers' reasonable, albeit mistaken, belief probable cause was present was a cause of Stephen's arrest. This defeats his First Amendment claim.

The Court GRANTS Defendants' motion for summary judgment on Plaintiffs' First Amendment claims.

### E. *Monell* Claims for Failure to Train

Plaintiffs' third cause of action alleges the City of Fountain Valley failed to properly train its officers. *See generally* FAC. In *Monell*, the Supreme Court ruled the legislative history of the Civil Rights Act of 1871 "compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Monell v. Dept. of Soc. Servs. Of City of New York*, 436 U.S. 658, 690 (1978) (emphasis in original). § 1983 liability attaches to municipalities when either its "official policy" or "permanent and well settled practices" causes a constitutional tort. *Id.* at 691. But "a municipality cannot held liable *solely* because it employs a [constitutional] tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.*

The Ninth Circuit uses a two-part test for *Monell* claims. First, a court asks whether a constitutional violation occurred; then, it asks whether the "city's policy caused the wrong." *Lowry v. City of San Diego*, 858 F.3d 1248, 1255 (9th Cir. 2017). For purposes of the second

prong, causation means the city's policy had the "moving force behind the constitutional violation." *Chew v. Gates*, 27 F.3d 1432, 1445 (9th Cir. 1994) (citing *Monell*, 436 U.S. at 694).

As explained above, one constitutional violation occurred: Stephen was seized inside his home absent probable cause. However, the City of Fountain Valley does not seem to have, and Plaintiffs have not identified, a policy promoting this constitutional tort. Moreover, *Monell* claims are successful in only "limited circumstances," where officers "so often violate constitutional rights that the need for further training must have been plainly obvious to the city policy makers, who, nevertheless, are 'deliberately indifferent' to the need." *Board of the Ct'y. Comm'rs. Of Byran Ct'y., Oklahoma v. Brown*, 520 U.S. 397, 403 (1997). Here, there is nothing in the record that the Officers, or any other officers employed by Fountain Valley, consistently violate constitutional rights. Accordingly, the Court GRANTS Defendant's Motion with respect to Plaintiff's *Monell* claim.

### F. Emotional Distress

Plaintiffs' ninth and tenth causes of action, respectively, are for intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED").

IIED and NIED claims require the plaintiff to suffer "severe emotional distress." *Crouch v. Trinity Christian Ctr. of Santa Ana, Inc.*, 39 Cal. App. 5th 995, 1006 (2019); *see also Wong v. Jing*, 189 Cal. App. 4th 1354, 1376 (2010) (ruling the level of emotional distress for NIED is "functionally the same" as that required for IIED). California courts have "set a high bar" for this requirement. *Hughes v. Pair*, 46 Cal. 4th 1035, 1051 (2009). "Severe emotional distress means emotional distress of such substantial quality of enduring quality that no reasonable [person] in society should be expected to endure it." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001 (1993) (internal quotations omitted). "Discomfort, worry, anxiety, upset stomach, concern, and agitation" are not enough to surpass this high bar. *Hughes*, 46 Cal. 4th at 1051. Rather, sufficiently severe emotional distress usually manifests itself in physical or other observable ways, like chronic vomiting, loss of bladder function, or

inability to work. *See Hailey v. California Physicians' Serv.*, 158 Cal. App. 4th 452, 476 (2007).

Here, while the evidence suggests the Plaintiffs did suffer emotional distress, it does not suggest this distress met the "high bar" of being severe. Teresa testified she has "anxiety" and a feeling of "being on edge" and "checking the front door making sure it's locked." SUF 101. Brett testified he had no ongoing psychological or emotional issues from being ordered outside or patted down. Deposition of Brett Hill, 20:9-11 (Dkt. 33). A.H., a minor, was only one when the incident occurred, and her father, Benjamin, testified the only behavior change he has noticed is that she may have more nightmares now than before the incident. SUF 109-115. C.H., a minor, now sleeps with her parents and one of her teachers described her as a "little upset" after the incident. SUF 119-124. The record is devoid of facts relevant to Stephen's mental health after his encounter with the Officers. None of these emotional symptoms rise to the level California courts have found to be sufficient to constitute severe emotional distress.

Since the undisputed facts do not establish Plaintiffs' emotional distress was severe under California law, the Court GRANTS Defendant's motion for summary judgment as to the Ninth and Tenth Causes of Action for IIED and NIED.

**IV. DISPOSITION**

For the above reasons, the Court **GRANTS IN PART** Defendants' Motion for Summary Judgment and **REMANDS** the case to state court. In particular, the Court grants Defendant's motion for summary judgment on all of Plaintiff's causes of action, except for the sixth cause of action for false arrest, which the Court remands to state court.

DATED: July 13, 2021

*David O. Carter*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE